**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Northwoods League, Inc.,

        Plaintiff,

   v.

Kokomo Baseball, LLC, and
Michael Zimmerman,

        Defendants.

Case No. 25-cv-03345 (LMP/ECW)

**ORDER**

---

This matter is before the Court on Defendants' Motion for Leave to Amend Answer and Affirmative Defenses and Assert Counterclaim (Dkt. 30) ("Motion to Amend"). For the reasons stated below, the Motion to Amend is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    Procedural History**

This matter arises out of a June 1, 2018 Affiliation Agreement between Plaintiff Northwoods League, Inc., (the "League"), Defendant Kokomo Baseball, LLC (the "Team") and Defendant Michael Zimmerman ("Zimmerman") to operate a baseball team, the Kokomo Jackrabbits, in Kokomo, Indiana, within the League. (Dkt. 2 at 3 ¶¶ 2, 7.)[1] As alleged in the Complaint, in September 2024, the Kokomo Jackrabbits stadium lease was not renewed by the City of Kokomo (the "City") due to an alleged failure by the

---

[1]    Unless otherwise stated, page number citations in this Order are to the CM/ECF pagination.

Team to submit a timely and written notice of renewal, causing the Team to be unable to field a team to participate in the League during the summer of 2025.  (*Id.* at 9-10 ¶¶ 27-37, 46.)  The Team, the League, and the City litigated the lease renewal in Indiana, and the Circuit Court for Howard County, Indiana, ultimately decided the lease had expired without renewal, which required the Team to surrender and vacate the stadium.  (*Id.* at 10 ¶¶ 38-40.)

The League then sued the Defendants in Minnesota state court, and Defendants removed the case to Federal court on August 22, 2025.  (Dkt. 1.)

The League asserts the following claims in their Complaint: (1) the Team breached the Affiliation Agreement by failing to renew their lease for use of the Kokomo City Stadium; (2) the Team is in breach of express warranties laid out in the Affiliation Agreement by failing to renew the lease with the City of Kokomo; (3) the Team failed to indemnify the League when contractually obligated to do so, resulting in at least $50,000 in damages to the League; (4) as guarantor to the Affiliation Agreement, Zimmerman is also liable for all damages resulting from the Team's failure to renew the lease with the City of Kokomo; and (5) after being presented with invoices for legal fees, costs, and expenses incurred during litigation stemming from the Team's failure to renew the lease with the City of Kokomo, the Team and Zimmerman retained the invoices for an unreasonably long time without paying or objecting to them and have thus assented to the League's accounting of the amounts due.  (*See* Dkt. 2 at 13-17 ¶¶ 62-90.)

Defendants removed this action to Federal court on August 22, 2025.  (Dkt. 1.) Defendants denied the League's allegations in the Complaint and alleged a multitude of

2

affirmative defenses in their September 2, 2025 Answer and Affirmative Defenses. (Dkt. 13).

The November 5, 2025 Pretrial Scheduling Order adopted the parties' proposed December 26, 2025, deadline for motions to amend. (Dkt. 24 at 4; *see also* Dkt. 22 at 8.) However, on December 24, 2025, the parties filed a Joint Motion to Amend Scheduling Order seeking to extend the deadline to file a motion to amend pleadings to January 9, 2026. (Dkt. 27.) The Court granted the Joint Motion. (Dkt. 29.) Defendants filed the present Motion to Amend on January 9, 2026. (Dkt. 30.)

## B.    Allegations in the Proposed Counterclaim

The proposed Amended Answer and Affirmative Defenses and Counterclaim ("proposed Answer") alleges in relevant part as follows:

The Team had discussions with the League about becoming a member-affiliate team of the League in May 2018. (Dkt. 30-2 ¶ 6.)[2] These discussions occurred over many weeks and perhaps months, while the Team was an actively operating baseball team as a member of a similar but different league. (*Id.* ¶ 8.) The Team also had an existing long-term lease agreement with the City to operate out of Kokomo Municipal Stadium. (*Id.* ¶ 9.) The lease agreement between the Team and the City of Kokomo was in writing, titled "Stadium Use Agreement," and dated July 11, 2014 (the "Stadium

---

[2]    For the remainder of this Order, references to paragraphs in the proposed Amended Answer and Affirmative Defenses and Counterclaim (Dkt. 30-2) refer to the Counterclaim portion of the proposed pleading, which begins on page 15 of Docket Entry 30-2.

Agreement" or "lease").  (*Id.* ¶ 10.)  The Stadium Agreement allowed for the Team's exclusive use of the Kokomo Municipal Stadium.  (*Id.*)

For the Team to become an affiliate member, the League required a personal guarantee from Zimmerman (the single member and manager for the Team), required the Team to assent to a series of lengthy affiliation-based agreements, and required the League to become a party to the Stadium Agreement.  (*Id.* ¶¶ 2, 11.)  The League required "operative language that allows for the option by [the League] of such an assumption of the lease, or some means by operation of law or enforcement acknowledgement by the parties that affords the same ability."  (*Id.* ¶ 11.)

The League eventually negotiated directly with the City for the inclusion of provisions amending the Stadium Agreement.  (*Id.* ¶ 12.)  On June 1, 2018, the League, the Team, and the City entered into an Addendum to the Stadium Agreement making the League part of the Stadium Agreement between the City and the Team.  (*Id.* ¶ 13.)

The League also identified, and obligated signatures, on league-based documents that recognized affiliation, but also obligated the League and the Team to one another, including requirements that the Team not compete against the League, not leave the League without paying a $3 million penalty, not sell its assets without the League's permission, and allow the League, if it desired, to take over the lease under the Stadium Agreement from the Team.  (*Id.* ¶ 14.)  In turn, the Team paid only $1 for entry into the League.  (*Id.* ¶ 15.)

4

Approximately one year after joining the League, the League agreed to a second amendment of the Stadium Agreement, allowing the Team a different cost structure. (*Id.* ¶ 16.)

About five years later, around May 2024, the Team engaged the City to discuss renewal of the Stadium Agreement. (*Id.* ¶ 17.) The discussions occurred virtually, and both the Team and the City discussed potential amendments to the Stadium Agreement. (*Id.*) According to Zimmerman, the Team was waiting for the City to propose amendments to the Stadium Agreement after the May 2024 discussion. (*Id.* ¶ 18.) Over the following months, the Team participated in the League's 2024 calendar, and worked with the City on changes to the stadium and potential opportunities for use of the stadium in other events. (*Id.* ¶ 19.)

On September 17, 2024, the City provided written notice that the Team had failed to timely renew the lease, and the City was moving to remove the Team from the stadium. (*Id.* ¶ 20.) The Team immediately contested the City's position, met with the City, and learned from this meeting that the City had no interest in a continued relationship or affiliation with the League. (*Id.* ¶ 21.) The Team further alleges upon information and belief that the League soon thereafter separately contacted the City to discuss the League's assumption of the Stadium Agreement without knowledge or consent of the Team. (*Id.* ¶ 22.)

On November 1, 2024, the City filed a lawsuit in the Circuit Court for Howard County, located in Kokomo, Indiana. (*Id.* ¶ 23.) The City sought a declaration that the Stadium Agreement had terminated. (*Id.*) The Team filed a timely answer and

5

counterclaim, contesting the allegations. (*Id.*) The City failed to name the League as a party, and instead the League intervened, stating "'[t]he League is a party to the Agreement and has a significant investment in [the Team's'] continued occupation of the stadium at issue.'" (*Id.* ¶ 24 (alterations in original).) The League further asserted they were contractually afforded the opportunity to cure any defects and receive notice of legal filings. (*Id.*) The motion to intervene was granted by the Indiana court. (*Id.* ¶ 25.)

During a December 17, 2024 hearing, the parties, including the League, agreed to submit their respective requests for declaratory relief on summary judgment. (*Id.* ¶ 26.) Both the Team and the City filed competing dispositive motions. (*Id.* ¶ 27.) The League filed a "concurrence" to the motion filed by the Team, instead of its own motion, with the concurrence putting forth facts not included in the Team's motion, and that "concurrence" was ultimately struck by the Indiana court as unsupported by the evidence and untimely. (*Id.* ¶ 28.)

On February 24, 2025, the Indiana court issued a written decision determining the Team failed to provide written notice to renew the Stadium Agreement, and as such, the Stadium Agreement was terminated on September 30, 2024. (*Id.* ¶ 29.) The decision was not appealed. (*Id.* ¶ 30.)

On March 17, 2025, the League sent a letter to Zimmerman terminating the Team's affiliation with the League. (*Id.* ¶ 31.) The Team alleges upon information and belief that the League would thereafter make the Team's territory and interest available for others to pursue baseball in Kokomo. (*Id.* ¶ 32.)

According to the proposed Answer, the League, because of its desire to protect its own interests, as opposed to those of a member, demanded that it be made party to the Stadium Agreement, acted behind the back of its member in dealings with the City, failed to take action that would protect the Team, acquiesced in a legal position by the City that was contrary to its own assertion, and otherwise terminated the Team's affiliation based on a false or misleading cause of events. (*Id.* ¶ 33.)

Defendants seeks to add the following counts against the League:

First, Count I is a claim for declaratory judgment, under Minnesota Statutes 555.01 et seq., related to the enforceability of the agreements between the parties. (Dkt. 30-2 ¶¶ 34-38.) It asserts that the Affiliation Agreement is unenforceable because of unconscionability,[3] as procedurally or substantively unenforceable; the League abandoned or waived any claim against the Team through its action in the Indiana litigation; and portions of the Affiliation Agreement (including the indemnity and liquidated damage provisions) are properly struck where, among other things, there was no real and voluntary meeting of the minds, there was an unfairness in bargaining power, terms were not commercially reasonable or acceptable, and terms unreasonably favored the League that had no general commercial need for such terms. (*Id.*)

In Count II, Defendants assert a claim for a Breach of Fiduciary Duty/Implied Duty of Good Faith. (*Id.* ¶¶ 39-45.) They claim that members, directors, and officers of non-profit corporations owe the same duties as members, directors, and officers of

---

[3] While Count I does not use the word "unconscionability," both the Court and the League understand that this is the theory asserted. (Dkt. 37 at 2.)

closely held corporations, namely, the duty of utmost good faith, trust, confidence, and candor. (*Id.* ¶ 40.) They also allege that under this duty, directors, officers, and members must perform their duties in good faith, in a manner consistent with (or at least not opposed to) the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use in similar circumstances. (*Id.*) Directors, officers, and members violate this duty when they take advantage of corporate opportunities for themselves or when their conduct is not undertaken in good faith. (*Id.*) Similarly, a party to a contract cannot act arbitrarily or unreasonably to prevent the other party from receiving the fruits of a bargain. (*Id.* ¶ 41.) The League, by and through its members, directors, and officers owed fiduciary duties, including the duty of loyalty and the duty of good faith and fair dealing, to the member teams, including the Team. (*Id.* ¶ 42.) As such, the League was obligated to deal fairly, honestly, and openly with the Team, and act in good faith without placing personal interests above the interests of the League, its members, and directors. (*Id.*) Defendants bring a counterclaim for breach of those fiduciary duties and implied duty of good faith as the result of the League contacting the City without the knowledge of the Team, failing to pursue remedies under the Stadium Agreement to which it was a party, and otherwise terminating the Team's affiliation in the League for events it knew or should have known it was responsible (or could have prevented). (*Id.* ¶ 43.)

Count III asserts a claim for tortious interference of the Stadium Agreement between the City and the Team, or into the economic advantage of the Team, through the imposition of the League's affiliation requirements as part of the Affiliation Agreement.

(*Id.* ¶¶ 52-54).  The Team alleges that because the League holds a special market position, with little competition and significant barriers to entry, both monetarily and non-monetarily, it owes its members a duty of good faith and fair dealing as a reciprocal fiduciary duty, and because it held a position of superiority over the Team similar to a buyer/seller relationship in which the seller holds superiority because of their unique possession of knowledge.  (*Id.* ¶¶ 47-48.)  The Team alleges that the fiduciary or buyer/seller-relationship took place over many weeks, or perhaps months, and included the specific acts of the League becoming party to the Stadium Agreement, and the sharing of information between the Team and the League to evaluate the opportunity of becoming an affiliate.  (*Id.* ¶ 49.)  In September 2024, the City sent the Team notice that the Stadium Agreement had not been renewed.  (*Id.* ¶ 50.)  In discussions following the notice, the Team learned the City had no interest in continued affiliation with the League but was not opposed to the Team's continued ownership structure or sale to third parties—provided the Team is no longer part of the League.  (*Id.* ¶ 51.)  Thus, it was the affiliation with the League making the renewal of the Stadium Agreement impossible. (*Id.* ¶ 52.)  The League's affiliation requirements, as part of the Affiliation Agreement, posed an improper interference with the Team's actual and prospective contractual relationship with the City, causing the City not to enter into or continue the relationship with the Team and/or prevented the Team from acquiring or continuing the prospective relation.  (*Id.* ¶ 53.)

The League knew that the Team had a reasonable expectation of economic advantage with the City, an existing long-term lease and relationship, that was foiled due

9

to affiliation with the League.  (*Id.* ¶ 54.)  These actions by the League have resulted in Defendants suffering damages including, but not limited to amounts paid to make improvements to the stadium as requested by the League, loss of their investment in the Team, and loss of revenue in a baseball team in which the public partner has no interest in continued affiliation with the League.  (*Id.* ¶ 55.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 15 sets the general standard for amending pleadings in Federal court and provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court. *See, e.g.*, *Niagara of Wisc. Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986).  The Eighth Circuit has held that although amendment of a pleading "should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend."  *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989); *see also Chesnut v. St. Louis County*, 656 F.2d 343, 349 (8th Cir. 1981)).

Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile.") (citation modified).

> Denial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended [pleading] could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Accordingly, in reviewing a denial of leave to amend we ask whether the proposed amended [pleading] states a cause of action under the *Twombly* pleading standard . . . ."

*Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation modified); *see also In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007) ("[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion.").

On a motion to dismiss filed pursuant to Rule 12(b)(6), a court must take the well-pleaded allegations of a claim as true, and construe the pleading, and all reasonable inferences arising therefrom, most favorably to the pleader.  *See Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 401 (D. Minn. 2020).  To survive a motion to dismiss, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  While matters "outside the pleadings" may not be considered in deciding a Rule 12 motion to dismiss, documents "necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation modified).  Thus, while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters

11

incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned. *Id.*; *see also Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012); *Advance Tr. & Life Escrow Servs., LTA v. ReliaStar Life Ins. Co.*, No. 18CV02863 (DWF/ECW), 2020 WL 5229677, at *7 (D. Minn. Sept. 2, 2020) (applying the same standard to a motion to amend under Rule 15) (citing *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)).

Here, the League argues that the proposed counterclaims are futile. With this standard in mind, the Court addresses, in turn, whether each count in the proposed counterclaim states a viable claim for relief as alleged.

### III.   ANALYSIS

### A.   Count I - Declaratory Judgment

The gravamen of Count I is that the relief sought by the League in the Complaint under the Affiliation Agreement is unenforceable under the doctrine of unconscionability. Indeed, Defendants argue in their supporting memorandum that the "documents/agreements" upon which the League seeks declaratory relief in the Complaint are unenforceable under the doctrine of unconscionability. (Dkt. 34 at 7.) The League counters that outside of conclusory assertions, Defendants have failed to allege any facts in Count I to support procedural or substantive unconscionability. (Dkt. 37 at 9-11.) While it is not entirely clear, the counterclaim for declaratory relief appears to not only be based on unconscionability of the terms of the Affiliation Agreement, but

also possibly on an argument that the Affiliation Agreement is unenforceable under a theory of waiver, as well as a lack of a meeting the minds during formation of this agreement. The Court will discuss these arguments in turn.

Under Minnesota law, if a court determines a clause within a contract is unconscionable, a court may refuse to enforce a contract entirely, sever an unconscionable clause, or limit the unconscionable clause to avoid an unfair result. *Carlson v. BMW Fin. Servs. NA, LLC*, 762 F. Supp. 3d 820, 825-26 (D. Minn. 2025) (citing *Maslowski v. Prospect Funding Partners LLC*, 994 N.W.2d 293, 302 n.6 (Minn. 2023)). A contract is unconscionable if "no-clear-thinking person would make it, or if no such person would accept it." *Carlson*, 762 F. Supp. 3d at 826 (citing *Wold v. Dell Fin. Servs., L.P.*, 598 F. Supp.2d 984, 988 (D. Minn. 2009), citing *Kauffman Stewart, Inc. v. Weinbrenner Shoe Co.*, 589 N.W.2d 499, 502 (Minn. Ct. App. 1999)).

The party asserting unconscionability bears the burden of showing the contract is **both** procedurally and substantively unconscionable. *See Carlson*, 762 F. Supp. 3d at 826 (citing *Butler v. ATS Inc.*, Case No. 20-CV-1631 (PJS/LIB), 2021 WL 1382378, at *19 (D. Minn. 2021)). Procedural unconscionability involves unfairness in the bargaining process and arises if a party had no meaningful choice but to accept the contract. *Id.* at 827. Substantive unconscionability involves unfairness in the terms of the contract and arises when the terms are unreasonably favorable to the party seeking to enforce an agreement. *See Butler*, 2021 WL 1382378, at *19. "Where both parties obtained real and tangible benefits from the execution of a contract, Minnesota courts generally conclude that a contract is not unconscionable." *Id.* at *21 (citation modified).

13

Here, Count I does not plausibly allege that the Affiliation Agreement is unconscionable.[4] The proposed counterclaims allege that the Team was already operating within a different league (the Prospect League) before entering the Affiliation Agreement with the League. Thus, Defendants have not alleged that the Team nor Zimmerman was an unsophisticated party to business agreements entered with the League, and in fact have effectively alleged to the contrary. Moreover, nowhere in the proposed counterclaims do Defendants plausibly allege that the Team had no meaningful choice but to accept the Affiliation Agreement. On the contrary, Count I alleges that the discussions the Team had with the League about becoming a member-affiliate team of the League occurred over many weeks and perhaps months, while the Team was already an actively operating baseball team as a member of a different league, with a stadium. (Dkt. 30-2 ¶¶ 6-9.) Considering that the Team was already part of a "similar league" (*id.* ¶ 8), had access to a stadium, and the negotiations occurred over a lengthy period of time, Defendants have not pleaded factual content from which the Court can reasonably infer that the Team had no choice but to accept the terms of the Affiliation Agreement. While the proposed counterclaim asserts that there "was an unfairness in bargaining power" (Dkt. 30-2 ¶ 38(c)), conclusory assertions, without supporting factual allegations, do not suffice, and in any event, an unequal-bargaining-power argument is insufficient in of itself to demonstrate that the Agreement between two business entities is unconscionable.

---

[4] The request for relief in Count I of the counterclaims is made on behalf of "[t]he League." (Dkt. 30-2 ¶ 38 ("The League respectfully requests . . .").) The Court assumes this is a typographical error and that Count I seeks relief on behalf of the Counterclaimants.

14

*See Takacs v. Guardian Life Ins. Co. of Am.*, No. CIV.03-2562 ADM/JSM, 2004 WL 1260109, at \*7 (D. Minn. June 8, 2004) ("[A] contract is not unconscionable merely because the parties to it possess unequal bargaining power."); *see also Bam Navigation, LLC v. Wells Fargo & Co.*, No. 20-CV-1345 (NEB/ECW), 2021 WL 533692, at \*4 (D. Minn. Feb. 12, 2021) (applying Minnesota law) ("Even assuming there was a disparity in bargaining power, this is not enough, by itself, to establish that the contract was procedurally unconscionable.").

Again, the counterclaim for declaratory relief appears to be based on more than unconscionability. The counterclaim asserts that the League abandoned or waived any claim, presumably under the Affiliation Agreement, against the Team through its action in the Indiana litigation. Count I does not identify the legal theory under which Defendants assert this argument, and the absence of any such legal theory is sufficient basis to deny the Motion as to this count and theory. That said, the Court acknowledges that "a party who first breaches a contract is usually precluded from successfully claiming against the other party." *City of Green Isle v. Boelter*, No. A05-2161, 2006 WL 2806867, at \*5 (Minn. Ct. App. Oct. 3, 2006) (citation modified) (quoting *Carlson Real Estate Co. v. Soltan*, 549 N.W.2d 376, 379-80 (Minn. Ct. App. 1996), *rev. denied* (Minn. Aug. 20, 1996)). However, the proposed counterclaim does not allege any contractual obligation by the League to intervene in the Indiana litigation against the City regarding the Team's failure to renew the lease, and the facts alleged in the counterclaim are that the League in fact did intervene and took steps to support the Team's position in the Indiana litigation. Further, there are no allegations that the result would have been any

15

different had the League done something different in the litigation.  Finally, to the extent that Defendants are relying on a breach of fiduciary theory, the Motion is denied for the reasons stated below (*See infra*, Section II.B.1.)

Count I also asserts that portions of Affiliation Agreement (including the indemnity and liquidated damage provisions) are properly struck where, among other things, there was no real and voluntary meeting of the minds.  A meeting of the minds is a necessary element of a contract under Minnesota law.  *See Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122 (Minn. 1980).  Outside of assertions of unconscionability addressed above, Defendants offer nothing but a conclusory allegation regarding lack of the necessary meeting of minds, which is insufficient.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).  The facts supporting Defendants' counterclaims must be clearly alleged, as Federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004).  Not only are no facts alleged supporting an absence of a meeting of the minds, but Defendants' assertion that there was no real and voluntary meeting of the minds is somewhat contradicted by the allegations in the proposed counterclaim that the parties engaged in lengthy negotiations, as noted above, leading to the Affiliation Agreement.  (Dkt. 30-2 ¶¶ 6-7.)

For all of these reasons, the Court denies the Motion to Amend as to Count I of the proposed counterclaim on the basis of futility.

16

**B.     Count II - Breach of Fiduciary Duty and Implied Duty of Good Faith**

Count II alleges that the League is in breach of its fiduciary duty and implied duty of good faith to Defendants.  Defendants argue that it has alleged conduct by the League that may present a violation of one, or both, standards.  (Dkt. 34 at 10.)  In support of these proposed theories, Defendants rely on the allegations in the proposed counterclaims that the League breached its duties to the Team, as a member of the League, by

> directly contacting the City of Kokomo without the knowledge of the Team, failing to pursue remedies under the lease of which it was a party, and otherwise terminating the Team's affiliation in the Northwoods League based on a string of events through which the Northwoods League knew or should have known it was responsible (or could have prevented).

(Dkt. 34 at 10 (quoting (Dkt. 30-2 ¶ 43).)

**1.     Breach of Fiduciary Duty**

The Affiliation Agreement has a Minnesota choice of law provision.  (Dkt. 2 at 40.)  The League is a Florida corporation with a principal place of business in Minnesota (*Id.* at 3 ¶ 1.)  The League argues that under the internal affairs doctrine, Florida law applies as to this particular counterclaim, as opposed to Minnesota law.  (Dkt. 37 at 12-13.)  However, the Court need not decide this issue, because the result is the same under Florida or Minnesota law.  *See Ronnoco Coffee, LLC v. Westfeldt Bros.*, 939 F.3d 914, 920 (8th Cir. 2019) ("[W]here the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question.").

The elements for a claim of breach of fiduciary duty under Florida law are the existence of a fiduciary duty and the breach of that duty such that it is the proximate

cause of the moving party's damages. *See Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002). Similarly, under Minnesota law, breach of fiduciary duty claims has the following elements: (1) duty, (2) breach, (3) causation, and (4) damages. *Futo v. U.S. Bancorp*, 25-cv-1464 (ECT/DJF), --- F. Supp. 3d ----, 2026 WL 252424, at *6 (D. Minn. 2026) (citing *Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019)).

Under Florida law, a "fiduciary relationship may be either express or implied." *Hogan v. Provident Life & Accident Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009). "Express fiduciary relationships are created by contract or legal proceedings." *Id.* Defendants have not pointed the Court to any contractual or legal proceeding creating an express fiduciary relationship.

Under Minnesota law, "[p]er se fiduciary relationships include trustee-beneficiary, attorney-client, business partnerships, director-corporation, officer-corporation, and husband-wife." *Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 916 (D. Minn. 2023) (citing *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009)); *see also Carlson, Inc. v. Int'l Bus. Machines Corp.*, No. 10-CV-3410 JNE/TNL, 2013 WL 6007508, at *6 (D. Minn. Nov. 13, 2013). ("Indeed, only a small number of relationships have been found to be per se fiduciary relationships, including trustee-beneficiary, attorney-client, business partnerships, director-corporation, officer-corporation, and husband-wife."). There are no such legal relationships alleged in the counterclaims.

Under Florida law, "[i]mplied fiduciary relationships 'are premised upon the specific factual situation surrounding the transaction and the relationship of the parties'

18

and exist where 'confidence is reposed by one party and a trust accepted by the other.'" *Hogan*, 665 F. Supp. 2d at 1287 (quoting *Cap. Bank v. MVB, Inc.*, 644 So.2d 515, 518 (Fla. Dist. Ct. App. 1994)).  "A fiduciary relationship cannot be unilateral.  The fact that one party places trust or confidence in the other does not create a confidential or fiduciary relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party."  *Myers v. Provident Life & Accident Ins. Co.*, No. 8:19-CV-724-CEH-CPT, 2023 WL 348859, at *5 (M.D. Fla. Jan. 20, 2023) (citation modified).  Therefore, a "party seeking to establish the existence of a fiduciary relationship must allege 'some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party.'"  *Id.* (quoting *Barnett Bank of W. Fla. v. Hooper*, 498 So.2d 923, 927 (Fla. 1986)).

Similarly, under Minnesota law, "[w]here the parties' arrangement is not of a type that has been designated a per se fiduciary relationship, the general rule in Minnesota is that it may be found to constitute a de facto fiduciary relationship only where certain 'special circumstances' are present."  *Carlson*, 2013 WL 6007508, at *6.  Several factors are considered when determining whether such "special circumstances" exist, including whether "one party placed its trust and confidence in the other, whether one of the parties enjoyed superior or excessive influence over the other party, whether one party relied on the other party's superior knowledge, whether there was disparity in business experience and invited confidence, and whether the alleged fiduciary knew of the dependent party's ignorance or lack of understanding regarding the at-issue transaction or transactions."  *Fairview Health Servs.*, 705 F. Supp. 3d at 916 (citing *Morton v. Park Christian Sch.*,

19

*Inc.*, No. 19-cv-03134 (ECT/LIB), 2022 WL 4803102, at \*16 (D. Minn. Oct. 3, 2022), citing 4 Minn. Dist. Judges Ass'n, Minnesota Practice, Jury Instruction Guides—Civil, JIG 23.10 (6th ed. 2021)) (citation modified).

Here, the relevant allegations of proposed Count II (and in part of Count III (Dkt. 30-2 ¶ 48)) set forth only conclusory assertions of a fiduciary relationship with no facts establishing dependency by the Team outside of an arms-length contract between the parties, or some degree of undertaking on the League to advise, counsel, and protect the Team and Zimmerman as weaker parties:

> 40. Members, directors, and officers of non-profit corporations owe the same duties as members, directors, and officers of closely-held corporations, namely, the duty of utmost good faith, trust, confidence, and candor. Under this duty, directors, officers, and members must perform their duties in good faith, in a manner consistent with (or at least not opposed to) the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. Directors, officers and members violate this duty when they take advantage of corporate opportunities for themselves or when their conduct is not undertaken in good faith.
>
> 41. Similarly, a party to a contract cannot act arbitrarily or unreasonably to prevent the other party from receiving the fruits of a bargain.
>
> 42. In this case, the members of the Northwoods League, individually and collectively, owed fiduciary duties, including the duty of loyalty and the duty of good faith and fair dealing, to its member affiliate teams, including Kokomo Baseball, LLC and its member, Michael Zimmeran [sic]. Accordingly, the Northwoods League, by and through its members, directors and officers, were obligated to deal fairly, honestly, and openly with Kokomo Baseball/Michael Zimmerman, and act in good faith without placing personal interests above the interests of the League, its members, and directors.

(Dkt. 30-2 ¶¶ 40-42 (spacing modified).)

20

At most, Defendants allege that the League's members, directors, and officers owed the League, a non-profit corporation, a fiduciary duty. (*Id.* ¶ 40.) Yet, as argued by the League (Dkt. 37 at 13-14), the directors and officers of a corporation owe their duty to act in the best interests of the corporation, not some outside affiliate or party they have contracted with (such as the Team or Zimmerman). *See* Fla. Stat. § 607.0830, subd. 1(a), (b); Fla. Stat. § 607.08411, subd. 1(a), (b). Because Defendants have failed to plausibly allege facts from which the Court can reasonably infer that the League owed the Team or Zimmerman a fiduciary duty, the Motion to Amend should be denied as to the breach of fiduciary duty theory.

Even accepting for the purposes of argument that Defendants have plausibly alleged that the League owed the Team (or Zimmerman) a fiduciary duty, this claim still fails because the proposed counterclaim fails to plausibly allege, under either Florida or Minnesota law, a breach of that fiduciary duty or that any such breach resulted in Defendants' alleged harm. The factual basis for the alleged breach are the following: the League directly contacted the City without the knowledge of the Team after the Team failed to renew the lease, the League failed to pursue remedies under the Stadium Agreement (to which it was a party), and the League otherwise terminated the Team's affiliation with the League based on a string of events through which the League knew or should have known it was responsible (or could have prevented). (Dkt. 30-2 ¶ 43.)

With respect to the League's contact with the City, the only allegation in the proposed counterclaim as to the content of the communication is that "[u]pon information and belief, and without knowledge or consent of the Team, the Northwoods League

21

would soon thereafter separately contact the City to discuss the Northwoods League's taking over the lease agreement for use of the City's stadium." (*Id.* ¶ 22.)  However, this occurred after the Team had already failed to renew the lease in writing.  (*Id.* ¶¶ 20-21.) In other words, there is nothing about the alleged conduct by the League that caused the Team to lose the lease, and to the extent the Team was damaged by the non-renewal of the lease, that damage was caused by the Team's failure to renew the lease in writing in the first place, not because the League contacted the City to discuss taking over the lease after the Team failed to do so.  At the hearing, Defendants' counsel argued that this proposed counterclaim was asserted because he did not know what the League was thinking and was not sure what discovery will show.  Counsel then proceeded to identify several questions that he wanted answered, including: whether the League believed that the Lease had been renewed or whether the City was talking behind the Team's back with the League.  This "discovery might show" argument might succeed under Minnesota law, where a claim can withstand a motion to dismiss for failure to state a claim if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded.  *See Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 603 (Minn. 2014).  But it does not satisfy the plausibility requirement in Federal court set forth in *Iqbal*, which requires the Team and Zimmerman to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  556 U.S. at 678.

Similarly, the allegation that the League, a party to the lease, failed to pursue remedies under the lease is vague because Defendants do not identify what remedy the

22

League failed to pursue. If Defendants are referring a failure to renew the Stadium Agreement, the proposed counterclaim admits that the Team was in the process of negotiating renewal of the lease with the City and that the Team inadvertently allowed the lease to lapse. (Dkt. 30-2 ¶¶ 17-20.) It is not plausible that the League somehow breached a duty to Defendants because the League also was not negotiating a renewal. As to the lawsuit, the proposed counterclaim alleges that the League intervened in the lawsuit filed by the City in support of the Team's arguments. (*Id.* ¶¶ 23-28.) In other words, the League did pursue remedies. To the extent the alleged failure to pursue remedies is the League's decision to file a "concurrence" to the Team's summary judgment motion (later stricken by the Indiana court) rather than filing its own summary judgment motion, Defendants have not plausibly alleged that the League had any such duty or that the outcome of the Indiana litigation would have been different had the League done so.

For all of these reasons, the Court denies the Motion to Amend as to Count II of the counterclaim on futility grounds insofar as it is based on breach of fiduciary duty.

### 2. Duty of Good Faith and Fair Dealing

"Every contract under Minnesota law, 'includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." *Armas v. Fifth Third Bancorp*, 315 F. Supp. 3d 1118, 1122 (D. Minn. 2018) (quoting *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995)). "Minnesota courts generally look to the [breaching party's] motive to determine whether the [breaching party] has breached the implied covenant of

23

good faith and fair dealing." *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp.2d 959, 966 (D. Minn. 2007). "A party breaches the implied covenant when it acts in bad faith, that is, when it refuses to fulfill some duty or contractual obligation based on an ulterior motive." *Armas*, 315 F. Supp. 3d at 1122 (citation modified). "Whether a party has acted in subjective bad faith is generally a question of fact reserved for the fact-finder, but that does not relieve a plaintiff of the burden to allege facts plausibly showing bad faith." *Futo*, 2026 WL 252424, at *8 (citation modified).

The League argues that Defendants failed to plausibly allege the necessary subjective showing of bad faith. (Dkt. 37 at 18.) This Court agrees. The most specific allegation in Count II is Defendants' assertion, upon information and belief, that the League and the City met without the Team's knowledge. (Dkt. 30-2 ¶ 43.) There is no allegation that the League breached the Affiliation Agreement by doing so or that any such meeting hindered the Team's unsuccessful attempts to renew the Stadium Agreement, especially given that the alleged meeting took place after the non-renewal, let alone a showing of bad faith. Indeed, it is not clear how this would amount to actionable conduct, when the proposed counterclaim includes an allegation that the City told the Team that it would renew the lease as long as the League was not involved. (Dkt. 30-2 ¶ 51.)

For all of these reasons, the Court denies the Motion to Amend as to Count II of the counterclaim on futility grounds insofar as it is based on breach of the covenant of good faith and fair dealing.

## C.   Count III – Tortious Interference

Defendants bring a claim alleging tortious interference by the League of the Stadium Agreement between the City and the Team, or into the economic advantage of the Team, through the imposition of the League's requirements of the Affiliation Agreement.  The Court addresses these claims in turn.

### 1.   Tortious Interference with a Contract

To state a claim for tortious interference with a contract in Minnesota, a party must show (1) the existence of a contract, (2) the accused's knowledge of the contract, (3) the intentional procurement of its breach, (4) the absence of justification, and (5) damages.  *See Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 998 (8th Cir. 2021) (quoting *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994)); *see also Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 880 (D. Minn. 2019) (citing *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998)).

The League argues that Defendants have not identified any contract they had with a third party to which the League was also not a party.  (Dkt. 37 at 20.)  Indeed, the only agreements at issue in the proposed amendments are the Stadium Agreement and the Affiliation Agreement.  The League is a party to both of these contracts.  This proposed claim is futile because a party cannot tortiously interfere with its own contract.  *See Nordling v. Northern States Power Co.,* 478 N.W.2d 498, 505 (Minn. 1991) ("The general rule is that a party cannot interfere with its own contract."); *see also Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.*, 847 F. Supp. 1437, 1449 (D. Minn. 1994) ("A party, however, may not interfere with its own contract."), *aff'd.* 40 F.3d 278, 280-81 (8th

Cir. 1994).  Moreover, as argued by the League (Dkt. 37 at 20-21), there was not a contract in existence to tortiously interfere with because Defendants themselves have alleged that the Indiana court ruled that the Team allowed the Stadium Agreement to expire without renewal.  *See Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982) (finding that, because the contract at issue was void, it did not satisfy the first element of the tortious interference claim).

For all of these reasons, the Court denies the Motion to Amend to assert a counterclaim based on this theory as futile.

**2.      Tortious Interference with Prospective Economic Advantage**

To plausibly allege a claim for tortious interference with prospective economic advantage, a party must prove (1) the existence of a reasonable expectation of economic advantage, (2) the other party is aware of the expectation, (3) the other party's intentional interference with the reasonable expectation was either independently tortious or in violation of a state or federal statute or regulation, (4) a reasonable probability the prospective economic advantage would have been realized in the absence of the tortious interference, and (5) damages.  *See Howe v. Kaal*, Civil No. 25-1946 (JRT/ECW), 2026 WL 674051, at *15 (D. Minn. 2026) (citing *Geiseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014)).  A tortious interference with prospective economic advantage claim can arise from wrongful interference with noncontractual as well as contractual business relationships.  *Id.*  The interference with a prospective economic advantage must be intentional and independently tortious or unlawful, not merely unfair.  *Id.*

26

Defendants contend that the allegations in the counterclaim that requiring the addition of the League to the lease, and other restrictive covenants within the Affiliation Agreement, made it impossible to renegotiate with the City because the City did not want to be affiliated with the League sufficiently states a viable tortious interference with prospective economic advantage claim. (Dkt. 34 at 10-11.) The League counters that as a party to a contract, it has the right to require that its counterparties adhere to their contractual promises, and it does not act wrongfully when it does so. (Dkt. 37 at 23.) Here, Defendants' tortious interference with prospective economic advantage counterclaim is based on unfavorable contract terms it entered with the League. That said, unfavorable contractual terms do not provide the independent tort claim needed for such a claim. Indeed, as noted by the League (*id.*), inherent in contracts, such as when Defendants entered into the Affiliation Agreement, is the fact that parties limit their future options to some extent. Under Defendants' theory, many contractual relationships would automatically permit a tort claim based on any restrictive terms in the parties' agreement. But Defendants have cited no legal support for this theory, and in fact Minnesota law suggests otherwise. *See generally*, *Gilk v. Fisher*, No. CV 25-2158 (JRT/LIB), 2026 WL 884100, at *8 (D. Minn. Mar. 31, 2026) ("If a tort claim is based on a breach of duty that "is indistinguishable from the breach of contract, the tort claim will fail, but if a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself, the tort claim is viable.") (citing *Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992)) (citation modified). In addition, Defendants' attempt to recast their claim based on alleged unfavorable

27

contract terms, including the requirement that the League would be added as a party to the Stadium Agreement, as a breach of fiduciary duty, ignores that the terms would have been negotiated before the Affiliation Agreement that allegedly gave rise to such a fiduciary duty existed.

For all of these reasons, the Court denies the Motion to Amend as to the proposed tortious interference with prospective economic advantage counterclaim as futile.

### VI.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**: Defendant's Motion for Leave to Amend Answer and Affirmative Defenses and Assert Counterclaims (Dkt. 30) is **DENIED**.


Date: July 9, 2026                    s/*Elizabeth Cowan Wright*
                                      ELIZABETH COWAN WRIGHT
                                      United States Magistrate Judge